Samuel S. Tripp, Spec. Ref.
Mr. Justice Livoti, presiding in Special Term, Part III, of this court, made an order dated January 18, 1968, upon the written consent of the attorneys for the respective parties, referring to the undersigned to hear and determine (CPLR 4317, subd. [a]) the issues presented by the pleadings in two actions consolidated by an order dated December 23,1966.
Vincent Donato, his wife Carolyn and her mother Lena Covais, entered into a formal contract dated April 11, 1966, with Impolis Baltrusaitis as seller, to purchase a two-family dwelling. This contract was conditioned “upon the purchaser’s obtaining, at his own cost and expense, on or before May 11, 1966, a commitment for a seventeen thousand ($17,000.00) dollar, twenty year, conventional mortgage, at the prevailing rate of interest at date of closing. In the event that the purchaser does not obtain such commitment on or before May 11, 1966, as above provided, then this contract shall be considered as cancelled * * * and neither party shall be liable to the other for any costs, damages or expenses whatsoever, except that the seller shall return to the purchaser the deposit hereunder. Purchaser agrees to make truthful and diligent application for said mortgage loan.”
*937 Claiming that they were unable to obtain the aforesaid commitment on or before May 11, 1966, the purchasers sued the seller for the down payment of $2,500. At the opening of the trial the seller discontinued his counterclaim for $2,500— alleged damages of $5,000 for loss of bargain, less the down payment.
Soon after the contract was executed the real estate broker who had brought about the sale filled out in his office an application form of Savings and Loan Association of Richmond Hill (hereinafter the Association), signed by the purchasers, for a 20-year first mortgage loan of $17,000. The Association received this application on April 12, 1966 and in due course issued a commitment dated May 6, 1966 for a mortgage loan of $17,000 with interest at 6% to be amortized, however, in 25 years by monthly payments of $110 plus 1/12 of annual taxes.
This change was made by the Association itself without first contacting the purchasers. Its then president informed the broker verbally that his executive committee would not approve the application for a 20-year loan, but only for 25 years, pointing out, however, that “ all our mortgages explicitly state that the mortgagor can make 12 additional payments each year without penalty ’ ’ so that without affecting the rate of interest, the 25-year term of the mortgage could be cut in half or anywhere between that period and the full term, depending upon the number of additional payments the purchasers might choose to make. The broker later informed the Association’s president verbally that this would be acceptable to the purchasers. The prepayment without penalty privilege, however, was never articulated in the written commitment sent to the purchasers or in any other writing, nor was a new commitment issued or applied for.
When informed on or about May 7 or 8, 1966 by the broker that a prepayment clause in the mortgage itself would permit the purchasers to reduce the 25-year term of the mortgage offered to 20 years or less without penalty by making additional payments, Mr. Donato, the spokesman for the purchasers was, as the broker described it, “ unhappy ” about it and wanted a straight 20-year mortgage. The broker thereupon advised him that if he, Donato, insisted on a 20-year mortgage, he had one for him — from Regency Servicing Corporation (hereinafter Regency). The broker claimed that he himself had verbally applied to Regency for a 20-year mortgage shortly after the purchasers signed the application to the Association for a similar commitment.
The so-called Regency “commitment” referred to by the broker, dated May 3, 1966, was not sent to the purchasers prior *938 to May 10, 1966. In the meantime, they changed their attorney and on May 9,1966 their new attorney wrote to the attorney for the seller enclosing a copy of a letter from the Dime Savings Bank of Brooklyn declining a 20-year mortgage loan for which the purchasers themselves had filed an application several days after they had signed in the broker’s office their application to the Association. Demand for the return of the down payment was made in this letter inasmuch as the purchasers had been unable to obtain the commitment contemplated by the contract. The seller’s attorney responded on May 12,1966 that the declination by the Dime Savings Bank of Brooklyn was ‘ ‘ totally irrelevant ” since he had on file the letter from the Association, dated May 6, 1966, indicating “ that it has approved a first mortgage loan * * * in the amount of $17,000, to be amortized over a term of 25 years ”.
Significantly, the seller’s attorney made no reference to the Regency letter dated May 3,1966. The efficacy of this document as a firm commitment is dubious, in any event. Certainly it was not persuasively established by an employee of Regency, who testified without personal knowledge of the facts. In addition, by its very terms, it lacked firmness as a commitment upon which the purchasers could rely. It opened with the printed words: “ We are pleased to advise you that we have received approval on a mortgage loan ” of $17,000 at 6% for 20 years, payable in equal monthly payments of $121.80 for interest and principal plus a sum equal to 1/12 of the annual charge for taxes and fire insurance premiums. The “ approval ” referred to was neither attached nor otherwise identified. Still more important, this letter concluded with the printed words: “ Subject to acceptance of discount by seller or broker ”. Thereby, the unidentified prospective mortgagee whose “ approval on a mortgage loan ” was allegedly received by Regency, clearly insisted upon the payment by “ seller or broker ” of a premium. No evidence of the amount thereof was adduced nor whether the seller or broker had agreed to pay it. Under all the circumstances the Regency letter was ‘ ‘ not such a commitment as would warrant an applicant for a mortgage believing he had such a mortgage ”. (Zuk v. Irion, 12 Misc 2d 871, 873-874.)
The question here presented is therefore reduced to this proposition: When a contract of purchase and sale of real property is conditioned upon the purchaser’s obtaining at his own cost and expense on or before a specified date, a commitment for a 20-year conventional mortgage in a certain amount at the prevailing rate of interest at date of closing, and the only firm commitment made available to him is for a term of 25 years, *939 albeit the mortgage to be made pursuant thereto would permit additional payments each year without penalty which could, if taken advantage of, reduce the term of the mortgage, may the purchaser cancel the contract and recover the down payment upon the ground that he was not able in good faith to obtain the commitment contemplated by the parties within the time prescribed in their contract?
A clause providing that a purchaser’s performance shall be conditioned upon his obtaining a certain mortgage commitment by a specified date is inserted for his ‘1 protection, apparently with the understanding that unless he procured the mortgage loan it would be impossible for him to perform the contract on his part. This being so, he was not in default since through no fault of his, the condition was not fulfilled, and cases such as Lawrence v. Miller (86 N.Y. 131), which hold that a purchaser who has defaulted in the performance of an executory contract of purchase and sale cannot recover payments made to the seller on account of the purchase price, are not controlling”. (Patersons v. Marchese, 10 A D 2d 639, 640.) The foregoing principle applies to the instant case if it be found that the purchasers were justified in rejecting the Association’s 25-year mortgage loan commitment.
That the purchasers demanded the return of their down payment on May 9, 1966, two days before the date by which the commitment was to be obtained, is not fatal to their case. Clearly the Association would not issue a 20-year commitment in accordance with the application signed by the purchasers and their application to another lender had already been rejected. Under these circumstances, it hardly is possible that such commitment could have been obtained elsewhere within the remaining two days. ‘1 The law does not require a party to await the happening of a condition which, without the fault of such party, is incapable of fulfillment ”. (Levine v. Robin, 27 A D 2d 747.)
The purchasers’ performance was conditioned upon their obtaining on or before May 11,1966 a commitment for a conventional mortgage for a term of 20 and not “ at least ” 20 years. Since the condition expressed in the contract was not fulfilled by the Association’s commitment for a 25-year term, the purchasers were, as a matter of contract law, excused from performance. “ The relevant contractual intent is that expressed in the contract, even though it may not accord with the subjective intent of the parties ”. (Peripheral Equip. v. Farrington Mfg. Co., 29 A D 2d 11,13.)
Plaintiff Kessler, a licensed real estate broker, seeks damages of $1,500 from the purchasers, the commission the seller would *940 have paid. Recovery is bottomed on allegations that the purchasers “ requested ” plaintiff to negotiate and bring about a sale of the premises to them by the owner and that he rendered work, labor and services as real estate broker in bringing about such sale “at the special instance and request” of the purchasers “ and upon their promise to pay the reasonable value therefor.” This promise is embodied in a printed paragraph of a binder form prepared by the broker and called “ agreement oe sale”. Blank spaces for the terms of purchase and sale were written in apparently by the saleslady employed by the broker. This document, dated April 6, 1966, was signed by two of the purchasers, Mr. and Mrs. Donato, in the broker’s office without benefit of counsel and witnessed by the saleslady. The reverse side, on which three provisions were typewritten, has the signature of the seller. The printed paragraph relied upon by the broker is well below the filled-in terms of purchase and sale. It reads as follows: ‘ ‘ The parties hereby agree that central real estate is the broker who brought about this sale and the seller agrees to pay, and hereby assigns to said central real estate brokerage commission at the rate of 6% of the purchase price, payable on receipt of said additional part payment. The purchasers agree that should the seller sign this agreement and the purchasers thereafter default, the purchaser will pay said brokerage commission. This agreement may not be changed orally.” Immediately preceding this paragraph is a printed one-line unrelated provision above which are the words printed in ink — “ subject to attorney’s approval ”. Since Lena Covais, the third purchaser, was not present at the broker’s office and had not signed the foregoing document, he discontinued his action against her at the opening of the trial.
The formal contract of purchase and sale executed in the office of the seller’s attorney on April 11,1966 provided for the closing of title at that office on or about June 1, 1966. It also provided that “ Central Real Estate [the business name of the real estate broker] brought about this sale and the seller agrees to pay the commission as per separate agreement.” This was signed for the broker by his saleslady and “ consented and agreed to ” by the seller at the same time that the contract of purchase and sale was executed.
The sellers’ obligation to pay brokerage commissions was originally unconditional as set forth in the binder. The same printed paragraph provided that ‘ ‘ should the seller sign this agreement and the purchasers thereafter default * * * [they] will pay said brokerage commission ”. By the “ separate agreement ” referred to in the subsequent formal contract, *941 the payment of commissions by the seller was made conditional. They were now “ to be due and payable only if, as and when title passes to the purchasers in accordance with the terms of said contract of sale ’ In addition, the formal contract provided ‘ ‘ that all understandings and agreements heretofore had between the parties hereto are merged in this contract, which alone fully and completely expresses their agreement”. The printed paragraph concerning commissions contained in the binder agreement thus merged in the subsequent formal contract of purchase and sale and consequently there can be no recovery thereon. (See Higgins v. General Elec. Co., 258 App. Div. 606, 608.) In any event, the purchasers having here been held entitled to the return from the seller of their down payment, the broker may not recover, as damages because of their alleged “ default ”, the commissions he would have received from the seller had title passed to the purhasers in accordance with the terms of the contract of sale dated April 11, 1966.
The same result would follow were the decision adverse to the purchasers in their action to recover the down payment. Proof of their attorney’s approval to which the binder agreement was subject was not adduced nor was there any evidence that they employed the broker to find a parcel for them. A broker 1 ‘ who is the procuring cause of a sale is entitled to no commission from the buyer unless the buyer has employed him and agreed, expressly or impliedly, to pay compensation for his services.” (Lee v. Woodward, 259 N. Y. 149, 150; Goff v. Adelson, 229 App. Div. 802; Garyl v. Greenwald, 21 Misc 2d 712.) As was stated in Parker v. Simon (231 N. Y. 503, 507), a contract of employment upon which a broker may sue a purchaser for damages, must be an “ independent contract for a valuable consideration by which defendant became liable for the payment to plaintiff of his compensation and, therefore, liable for damages for breach of contract.”
It has been held that “ each case in which allegations of employment are made must be decided on the particular facts. ’ ’ (Grossman v. Herman, 266 N. Y. 249, 253.) Accordingly, the broker’s reliance on the cases cited in his reply brief is misplaced. One of such cases, Duross Co. v. Evans (22 A D 2d 573, 574), typifies the other cases and, indeed, cites them in the following context: “ ‘ Where * * * the employer of the agent itself prevents the earning of the commission by refusing to deal on the basis which was offered to the agent, the purchaser is obligated to pay after the agent has procured a seller on the terms and for the consideration, quantity and quality proposed by the purchaser (Pease & Elliman v. Gladwin Realty *942 Co., 216 App. Div. 421).’ (Westhill Exports v. Pope, 12 N Y 2d 491, 496, supra.) (James v. Home of Sons & Daughters of Israel, 153 N. Y. S. 169; McKnight v. McGuire, 117 Misc. 306.) ”
In Duross (supra) a prospective purchaser employed a real estate broker to find a parcel and then authorized him to submit an offer to the owner; later he arbitrarily refused to sign the contract prepared by the owner accepting the offer. The court held that in such circumstances the prospective purchaser may be liable to the broker for damages consisting of commissions of which the broker was deprived. The element of employment of the broker by the purchaser is missing in the case at bar. Here the seller listed his two-family dwelling with the Long Island Real Estate Board’s Multiple Listing Service, of which plaintiff Kessler is a member. This is an organization of Central Queens brokers through which its members “ cobroker ” listings that they receive. Such listings are accomplished by the sellers signing with the central body a standard 6% commission agreement, regardless of which broker makes the sale. Such a listing was here made by the seller prior to the time when Mr. Kessler or his saleslady met the purchasers herein and showed them the property, following which Mr. and Mrs. Donato and the seller signed the binder agreement witnessed by the broker’s saleslady.
In the light of the subsequent formal contract, by the terms of which this binder merged, and the provision in the ‘ ‘ separate agreement ’ ’ therein referred to providing for payment of commissions by the seller to the broker, it may not be inferred that the purchasers employed him or agreed to pay commissions or became liable therefor in the event the deal was not consummated by reason of their withdrawing therefrom.
The foregoing views make it unnecessary to pass upon the purchasers’ claim that the inclusion in the binder here involved of a printed provision subjecting them to liability for broker’s commissions was unconscionable. (Of. Uniform Commercial Code, § 2-302.)
Judgment is directed dismissing the broker’s complaint on the merits without costs and in favor of the purchasers against the seller for the down payment of $2,500 with interest from April 11, 1966 (Zuk v. Irion, 12 Misc 2d 871, supra), likewise without costs. Inasmuch as the surety on the discharge-of-lis-pendens-undertaking, filed pursuant to the order of this court dated October 18, 1966, has not been made a party to this action, no relief against it may presently be granted. (Cf. Adams Eng. Co. v. Menowitz, 53 Misc 2d 364.)